Bristol Springs Custom Homes v. Argos Group May it please the court, George Sideropoulos for Appellant Bristol Springs Custom Homes. Bristol Springs, a Martinsburg business, bought insurance for exactly the situation that unfolded. A jury entered a $325,000 negligence verdict against it. Its insurance company's response to the verdict was another lowball offer, this time $125,000. Thereafter, it threatened a statutory judgment action to avoid coverage entirely and stood by with its hands in its pockets while Bristol Springs went bankrupt. Ultimately, Colony Insurance Company paid the verdict, plus interest, but only after Bristol Springs filed the incident lawsuit alleging breach of contract, what's colloquially referred to as common law bad faith and a statutory cause of action for unfair claim settlement practices that rise to the level of a general business practice, a UTPA bad faith case. The district court nonetheless held that Bristol Springs attorneys were not necessary to achieve the settlement. That conclusion is wrong as a matter of West Virginia law and we request that the court reverse. I will argue two issues. First, that Bristol Springs substantially prevailed on indemnification and is entitled to hayseeds damages, again, what is sometimes colloquially referred to as common law bad faith. Second, that Bristol Springs had standing to assert a statutory bad faith cause of action under the West Virginia UTPA. Thereafter, I will respond to the appellee's cross appeal regarding certifying this issue to the West Virginia Supreme Court. Well, we call it Tiger River in South Carolina, but you call it hayseeds in West Virginia. There's no law allowing hayseeds action against a third party, is there? I think there is, Your Honor. Is there a West Virginia case that holds that because the problem with that, allowing that kind of stuff, and I was a plaintiff's lawyer, by the way, is foreseeability, which is the key to the hayseeds and Tiger River and all those cases. Yes, Your Honor. I think this ties into the Stuckey and Selango opinions that address the UTPA provision kind of elegantly. In one sense, you cannot get hayseeds damages for getting your case settled when there's a disagreement about trying to get your case settled as a civil defendant. But once a judgment order has been entered and you make a claim, it's now a lost claim. It's no longer a situation where it is a third party claim. It is a first party claim for indemnity under your, in this case, commercial general liability policy. And I think that that is explicit in both Stuckey and Selango that emphasizes there was no judgment order entered in those cases and that this court has also addressed that very issue in Graham to some extent by parsing out what it means to be a first party claimant, a third party claimant, and a first party policy and a third party policy. I hope that addressed the court's concern in that regard. The district court in this case held as a matter of law that... It's about the counterclaim here. You had a counterclaim and some question is whether you can have relief in your instance if you have a counterclaim, you haven't released it. You can't get anything approved until it's over, can you? You would simply pay the verdict amount. That would discharge all liability. The novel argument that's made by the appellees that somehow the underlying defendants having a counterclaim would extinguish the obligation of Colony Insurance Company to indemnify their policyholder for a judgment is novel, but it's certainly not persuasive. In other words, if the insurance companies wanted to pay a compromise amount, they could certainly try to negotiate that with an underlying defendant who may have concerns about the coverage issue, but that wasn't the case here. Even if they were going to pay the full amount, the insurance company is not going to write the check without a full and complete release of all claims. And isn't it your counterclaim that held up this thing? So it would satisfy the judgment order? No, no. Well, that may be true, but in this litigation, it won't if you've got a counterclaim hanging out there. Because it would satisfy the judgment, there would be no need for a release. Would you have signed a release? In other words, would I as the insurance company or would I as the underlying defendant? On the counterclaim, would you have signed a release waiving the counterclaim? So in this case, underlying defense counsel absolutely offered to waive the counterclaim. Leanna Stinson did that. That's in the record. And that was done following the judgment, following the verdict before bankruptcy. I thought you had a counterclaim. We did. My question is, would you have released it? Yes. And in fact... Why did you do it? So it was offered as part of the first kind of settlement offer by our client in the underlying litigation. When is it in the record that you agreed to drop your counterclaim? Let me see if I can find you the... I may be reading the record wrong. If I am, I apologize. But it seems to me, my recollection of the record is you wouldn't let go of that counterclaim and it was dropped. I'm clearly not doing a good enough job of explaining this. It's certainly not the court's fault. Yes, the underlying defendant, Bristol Springs, offered to release its counterclaim. At that time, the insurance company only offered to pay $150,000 to settle the judgment. This is post underlying trial. Then, because that obviously wasn't going to get the job done, because they wouldn't pay the entire verdict, Bristol Springs was forced into bankruptcy. They couldn't get credit. They couldn't afford their bills. At that point, the right to the counterclaim is now owned by the bankruptcy trustee. It's no longer owned by the underlying defendant. And I think that may be where the confusion of the court is. But I think that's really a red herring. I don't know that the court needs to get to the issue of the counterclaim, because to the extent that the insurance company pays the verdict amount, the counterclaim can operate independently as a claim. And there's no longer any sort of liability for the judgment that's been entered against Bristol Springs, period. Counsel, you say if the insurer just quote, paid the verdict, but the cases, including the Hadorn case, for example, from the Supreme Court said, I think the line is it takes two to negotiate. And as I read the record, the only monetary demand or offer, depending on how you look at it, prior to the lawsuit was for $391,000. And then you say, well, the next thing we had to do, we had to loop to sue. So it seems to me that under the Hayseeds analysis, there are a couple of components that require a showing of necessity. One is that the insured take reasonable steps to try to settle without filing suit. Otherwise, how do you show necessity? The next is that essentially despite those attempts, the insurer completely refuses. And that third, but for the litigation, there would not have been a settlement. But here the colony was offering money. It was kept increasing its offer. It was up to $150,000. You had only made a full, no compromise demand. How does that put you in Hayseeds territory? Yeah. So in order to prevail on a Hayseeds claim, a plaintiff does not need to show bad faith on the part of the insurance company. Only the demand for the policy proceeds or a demand for some amount was made. And that thereafter they have substantially prevailed when the insurance company offers less than that amount. And this really is an elegant solution by the West Virginia Supreme Court because it prevents a situation where an insurance company can make lowball offers and say, well, we offered something. And then a policyholder has to incur the cost and expense of protracted litigation in order to get the benefit of the bargain. So here, Colony and Argo had all the time in the world to try to get the claim resolved for any amount of money that they possibly wanted to prior to the judgment entry. But the question is going to but for compensation, as I understand it. And you've got an instance, as the judges pointed out, in which you've got insurer making some efforts toward negotiating before this lawsuit is filed, making efforts of going back and forth on it quite a bit. And then even you and your litigation posture, you have a counterclaim out there. And so you've got efforts are being made. Where's the but for causation that a jury could come out of that with? Thank you for the opportunity to address that. Colony and Argo have indicated throughout the litigation that there was very little coverage in this case. The coverage analysis that they did indicate that there was only coverage for broken windows. That's reaffirmed in a conversation by Dawn Larson, who was the adjuster for Colony with underlying counsel for Bristol Springs, Leanna Stinson. And that's in the record and in the underlying briefs that there's just not a lot of, and I forget the turn of phrase that she used, indemnity here. But essentially that we, we Argo and Colony don't have a lot of exposure. You guys are going to have to figure it out on your own, which is why the referral is made to bankruptcy counsel. Because obviously, Bristol Springs didn't have the cash on hand or the liquidity to satisfy the judgment. And that's what compels the complaint for breach of contract, alleging that in fact, there was a fatal error that was being made by Colony and Argo, which is they didn't appreciate that under the Charrington case, this was a covered claim. And that's really the answer to the but for question. But by the time you sued, they had already offered, put $150,000 on the table. Yes. Which was contrary to what they had said in less than half of the verdict amount. And I really was just kind of an effort to say, we'll wrap this up. But so then on this record, you're, you necessarily have, it seems to me your position necessarily has to be that you, that Colony had to negotiate against itself. It had to make multiple moves in a row. You didn't counter the 150 before you sued. I mean, I wasn't the, I don't have to, I'm not the underlying plaintiff. And what we really wanted was indemnity. When Argo and Colony say, we're going to gamble by not paying the judgment amount because we don't think that it's actually a covered loss and lose. But you don't think they offered $125,000, $150,000 for some broken windows. There's no explanation for why. I mean, I dare not even speculate how much it must have cost to put on a trial, what the appeal would cost and what they were paying their lawyers. And you know, if they really thought they were going to win on an appeal, they'd have to try the thing again. I think they were just trying to get out. And they knew that there was a bankruptcy attorney that was here and potentially new counsel, coverage counsel that may come in. You have substantial time you've reserved for rebuttal. So we'll hear you when you come back. Thank you so much. All right, you may proceed. Good morning. May it please the court, Jack Ryder and Matt Perry on behalf of Argo Group and Colony Insurance Company. I'll start off by talking about our argument with respect to the appeal with respect to why the judge was correct if the Hayseeds Doctrine applied at all in the conclusion that the judge reached. First of all, Judge Owen, as you pointed out, it is a but-for analysis. And the bottom line is that in order to establish entitlement under Hayseeds Doctrine, it is very well established that there was a requirement that Bristol demonstrate a but-for causation, that a retention of counsel was necessary to obtain resolution. And as several of you pointed out during my opposing counsel's presentation, the settlement negotiations were forthcoming by Colony immediately after the verdict came in. And this is reflected not only by the testimony in the record, but there are abundant claim notes that are part of the record, JA 1012, where shortly the day after the verdict, there's internal notes memorializing the fact that Ms. Larson, on behalf of Colony, talked to the insured about getting this back to mediation. At JA 1013, there's continuing correspondence, or excuse me, JA 1011, where this is October 24th, just days after the verdict, reflections of Ms. Larson's communications with plaintiff's counsel and discussions to, quote, determine a plan for resolving. Meanwhile, the parties were actively working on a post-trial motion. There was no risk of any sort of execution because everybody understood that because the post-trial motion was being prepared and would be filed timely, that there would be a stay of any sort of execution efforts. Let me ask you this. You got a judgment of $325,000. You offer $125,000, $150,000. I mean, you got to believe with that differential there, that Bristol is going to owe some money if you only pay that amount of money for it. I mean, they have a right to fear that they're going to end up holding a lot of money for this thing when they have insurance. Understood, but there were ongoing negotiations. This wasn't a hard stop. And the basis being that you didn't think you owed the full amount, the coverage thing that you heard what he said in terms of broken windows. They're a little bit more than broken windows. Obviously, because it was $125,000 you owed, but it must have been some coverage question here that would prompt you to offer a lowball offer on a $325,000 judgment. So first of all, Your Honor, there were certainly coverage questions, which is why Colony defended under a reservation of rights and defended the insurance- Procedurally, these questions, I'm trying to think, seems like to me when you have that, you have a declaratory judgment or something, or some type of declaratory action on the part of the insurance company that says, no, we don't defend, we don't cover, get all those questions here. And it sounds like we're at the end of the case, and now the insurance company says, no, I'm not paying that, I won't negotiate this judgment. But Bristol got a judgment, $325,000. So the question, then they say, they got to get counsel to get you to do it. And of course, that's the question. The question is, does the lawsuit make you pay this amount of money? In other words, did they have to get a lawyer to do this, and then you pwned it up then? And the facts don't support that conclusion, Your Honor. The undisputed material flat facts, and it's unequivocal, the timeline is clear. The timeline makes very clear that Colony, the day after the verdict, or within days after the verdict, immediately stepped up to the plate. I would respectfully submit that $150,000 on a $300-something-thousand-dollar verdict is certainly not a paltry sum. It's a starting point for negotiations. It is if you on the hook put $175,000 different, it is. Whatever the difference is on it. And again, Your Honor, I understood, but the question is the but-for. And as Your Honor pointed out, and Judge Floyd, I think you also pointed out, the fact is there was a counterclaim that held up the resolution. And again, the testimony, the timeline, and the evidence, undisputed, establishes that there were communications where Colony said to Bristol's counsel, and there were communications with defense counsel, communications with personal counsel, before bankruptcy counsel was even hired. We heard a lot from counsel, and we saw this in the brief, and a lot of argument below was this notion that somehow Bristol had no choice but to negotiate. Negotiations were ongoing, number one, before bankruptcy counsel was even retained. Number two, there was discussions about withdrawing the counterclaim before bankruptcy counsel was even retained. And there was also the notion, understood and undisputed, that the post-trial motion stayed execution. So the concerns that I've heard expressed simply were not supported by this record. Understand, again, negotiations are negotiations, and those were going forward before the bankruptcy counsel was even retained. You know, it really comes down to a question of, I guess, if you've done nothing, that's one thing. But the picture is, where does it become essentially nothing and not much? I mean, yeah, you did some negotiating, but if you offer $125,000 off of a $325,000 verdict, and you call that negotiating, and I guess, I don't know, the incentive to negotiate. Who are you negotiating with? I think, Your Honor, the best way to answer that question is to juxtapose this case with the Bailey case. Who were you negotiating with? When, at what point, Your Honor? On the $125,000. Well, the negotiations were ongoing. There was communications. With whom? With defense, with the plaintiff's counsel, directly with, you know, and this was all communicated with personal counsel. Why would plaintiff's counsel take that with a $325,000 verdict when it's got a company there and insurance company? And again, Your Honor. What would move them to take $325,000? Judge Lewis said he did a little plaintiff's work. I did it too, but I'm trying to figure that one out. Who is going to take that as a plaintiff's counsel if I got a company sitting on the other side with a $325,000 verdict with pre- and post-judgment interest on tack to it? And you come along as the insurance company that says, I'm going to negotiate this to $125,000. Where is that incentive to even take it? Your Honor, when money is on the table and post-trial motions are pending and an appeal may be coming, as there was going to be. But money on the table is the key. And Lord knows I had enough judgments on the wall that never got paid. But when I got an insurance company on the other side, something's going to be paid. And an insurance company, I'm just trying to understand, what's the negotiation with the plaintiff's lawyer on this thing? I understand the court's point. I just, I want to justify. But what's the answer? I got the point. We both got the point. What's the answer to that? Because it's confusing to me and it may be plain as to what was going on here, but I can't understand it. As a plaintiff's lawyer, unless you felt like Bristol couldn't pay you anything or didn't have any assets on this thing, you can get that judgment some kind of way, whether you go to own a company or something that is a plaintiff's lawyer. There's no way in the world I'd take $125,000 on a $325,000 verdict with a company. Now, if it was a guy on the street that had nothing, oh, yeah, I think we could talk a little bit. Your Honor, I hear you, Your Honor. The point I'll make in response is that the record reflects that at all times the plaintiffs were willing to take less. What that was was a matter of open negotiation, and that's reflected by the record. On the Hayses issue, not necessarily me, but folks in my chambers have looked at Hayses cases, and every one of them, they talk about first party claims. Would it be reasonable for us to predict that the West Virginia Supreme Court would not extend a Hayses claim to a third party? Thank you, Your Honor. I'll turn to the cross appeal then with that question, and I'll rest on my brief for the statutory issue and the standing issue unless there's any questions about that because I'm running low on my time. Let me turn to the cross appeal. Your Honor, I absolutely believe that this court can determine that the Supreme Court, or it could certify the question, but I believe this court can determine based on the unbroken line of authority that the insurance claims like this one, and Your Honor started off at one point by asking my opposing counsel that question, and I think that if we look at the history and the development of the Hayses doctrine, it's always been a first party principle. The Hayses case itself was limited to property damage cases, talking about when a policyholder substantially prevails in a property damage suit against its insurer, and when we look again at the history or the evolution of these Marshall v. Sassin, uninsured motorist cases, Miller v. Fluharty, again, uninsured motorist, first party claims, Haydorn v. Shea, LeMasters v. Nationwide, talk about the fact that when we're dealing with the Hayses doctrine and that principle, it necessarily is a first party principle and not a third party claim, and there's really no reason that one would extend the Hayses damages, the Hayses principle to a third party claim because there are other mechanisms that exist for purposes of allowing a sort of, I guess you'd call it a fee shifting or an award in a third party context. So for example, and let me also, look, let me take a step back for a moment and just address the point that the idea of the concept of the substantially prevailing test, sort of the driving test that dictates how you analyze the Hayses doctrine, the concept of substantially prevailing doesn't fit into the contours of a third party case. When one has a, even that threshold question, right, when one says in examining Hayses, did the insured substantially prevail in their pursuit against the insurer in pursuit of retaining funds and was an attorney necessary to get there, that doesn't fit into the contours of a third party case. And similarly, when we examine sort of the test for what constitutes substantial prevailing, you know, the amount of damages recovered by an insured juxtaposed with the amount originally offered, whether it's through a verdict or through a settlement, once again, does not fit within the contours of the Hayses doctrine, which is really necessarily a first party principle. And how do you square that with the chronology here with where the offer on the offer jumped to at or near the verdict? So, and just to make sure I'm asking this correctly, you're talking about this in the context of across the cross appeal or the principal appeal or both? Because I want to... Well, from the insured's perspective, as I read the cases under Hayses, the context is to protect insureds and to prevent an insurer from stringing along an insured in ways that causes harm to the So just to make sure that I'm answering your honor's question, the kind of colloquy, the back and forth here was a third party scenario, not a first party scenario. So if we, again, we've stepped back from what I consider to be the application of the Hayses doctrine. If in this case... Yes, you need to do that because you should certify it. Well, we certify it and the court comes back and say it is. You don't want to say that's the end of this case. You want us to go back now and look at the question that the judge just posed here. What I would ask for in this case is that the court would theoretically reverse and remand for entry of judgment in favor of Colony and Argo on the fact that the Hayses doctrine doesn't apply at all. And there is no... In other words, this is not a circumstance where there's a basis for extra damages because it's a third party scenario. As a third party scenario, this is... And to be clear, this is never left undefended. And so this is kind of switching back to when you examine what are the protections in a third party context. They were always defended, never left to their own devices, never exposed to an excess judgment. In fact, to the contrary, the amount of the demands were always below policy limits. So they were never in a circumstance where they would have been exposed to an excess judgment. In a third party context, which is what this is, had they been exposed to an excess judgment, there are alternative remedies available under law that exist that specifically provide the framework for recovery that Hayses fills the gap for the first party claims and the common law basis for recovery fill the gaps on third party claims if an insurer is subjected to an excess judgment or is left undefended. Let's go back to what you want. Uh, I think we normally operate under the theory that we decide only what we necessarily have to decide. That is correct. If we... The only reason we would have to get to the Hayses third party is if we were to reverse the trial judge on the renewed judgment for Hayses damage. That is... I agree with that, your honor. Procedurally, if this court concludes that the judge was correct, then technically it does not reach the cross appeal. That is accurate, Judge Floyd. And it wouldn't have to predict. That is also correct, your honor. That is correct. Now, certainly, you know, this court always has the authority if it finds the question one that is sufficiently indicative of needing of clarity, the court still has the authority to certify it. But of course, I agree, Judge Floyd, that if the court concludes that you appeal, then the court does not reach the cross appeal. My question, follow up to, do you really want a certified question? Your honor, what... Obviously, what we're here today is to ask the court to affirm. And ultimately, if the court should affirm, then we understand that that would be a sufficient relief for what we seek. The cross appeal is, of course, a backstop if the court were to determine that for any reason it were to not agree on the principle appeal. I respectfully submit that here the court can and should affirm. And I understand also that that would eliminate procedurally the court's need to go forward. Now, I'm into what would be my rebuttal time on the cross appeal, but I will ask before I sit down, if I may, are there any questions the court has as to the principle appeal, either as it pertains to the Hastings issue or the statute, which I didn't really address as a standing issue, which I address as vigorously? Sure. Just one to go back to that. Yes, your honor. Thinking about the but for standard. Here, chronologically, Bristol filed the lawsuit November 13th, 2023. Within weeks, six weeks, or I take that back, within two months, the offer on the table jumped from 150 to 250. And then within five or six weeks after that, the offer jumped to 385. Just chronologically, if we're thinking about but for cause in a general tort context, it appears that just based on that chronology, a reasonable jury could find that it was the lawsuit that triggered the increase. Now, that doesn't, I think, answer the question from a Hastings perspective because of the questions I was asking Mr. Sideropoulos. Sure. But I think you're saying that no reasonable jury could find that the lawsuit spurred the increase of offers. That's correct, your honor. And I'll respectfully suggest that your honor's question falls into the concept of the post hoc ergo propter hoc principle, which the Jordan case said, let's not follow that logic. And what I mean by that, respectfully, is the fact that one thing follows another does not mean that there's a but for causal relationship there. And that's why in the Miller case, the court talks about the importance of examining the totality of the negotiations and not just looking at something like timing. Timing is not indicative of causation. What is indicative is whether or not the history reflects a causal relationship between the retention of counsel, the need to retain counsel, and the settlement. And that is not the case here. The chronology is quite clear and we've cataloged it through our brief. I can address any specific time principles, but again, once at this point, unless there are any further questions, I ask that the court affirm. Thank you. Thank you. All right. Mr. Sideropoulos, did I get that correct? Close? You guys are honorary Greeks. We've got a secret handshake and I'll show it to you afterwards. I'm afraid the Greek I am, you are not. I'm not even that Greek. My last name just really is. Thank you for appreciating my levity. This is the first time I've had the opportunity to argue in front of the fourth circuit and it really is an honor and a pleasure. You're okay. You are impeccable. Thank you so much. The appellees would have you believe that the insurance company was going to pay the verdict plus interests and costs out of the kindness of its heart on behalf of its policyholder and that the ultimate settlement that was paid in this case was done not because they were subject to a lawsuit for breach of contract and made aware that their coverage analysis was entirely wrong and ignored binding Supreme Court precedent but that it had something to do with some other unexplained, unarticulated reason. That reason isn't articulated in any of their briefs or in their claim file or before this court. Counsel, I don't think they're saying that they would have paid out of the kindness of their heart. I think they're saying negotiations were ongoing. This was we were going to get a deal done and then Bristol Springs filed bankruptcy and filed a lawsuit. That's what, to the extent there was any delay in getting a deal done, that's what caused it. There's no basis in the claim file or in the record that suggests that they would have paid that amount. The only evidence in the form of testimony is that conversation between Don Larson and Leanna Stinson which indicates that there's little to no indemnity. That's the only post judgment evidence in the record. That's the you're on your own comment? No, so that's also in the record. That was from a court watcher who we ended up not deposing in the underlying litigation but they were hired by the carrier to monitor the trial and the district court was not real impressed with the plaintiff's affidavit. That's ultimately a question of fact but we certainly don't need it in this case. The key evidence really is that conversation that spurs the hiring of bankruptcy counsel and ultimately coverage counsel which is that conversation between Don Larson, the frontline adjuster, and Leanna Stinson who was underlying defense counsel. Argo and Colony understand the economics of litigation. They understand that they can use their superior financial strength to muscle compromised settlements and insurance companies are certainly entitled to do that before the judgment is entered but once the judgment is time to deliver on the promise to pay or to suffer the consequences which are written into the law. The reason that Hays Seeds is an elegant and brilliant doctrine is because it prevents insurance companies from offering modest amounts of money using their superior financial position to coerce small settlements and when they fail to not suffer any consequences and in this case that's precisely what happened. They failed and while they were trying to coerce a compromised settlement for less than they owed, my clients went bankrupt. I don't recall in the record that and correct me if said they wouldn't cover the settlement. Is that correct? There was no formal letter saying you know this is our final offer but the reality is that when they don't meet the demand that's precisely the scenario that Hays Seeds is set up for. Hays Seeds doesn't require a denial. It doesn't require bad faith. It just requires that a policy substantially prevail on a claim for in this case indemnity and I think that's pretty explicit in the case law. My adversary indicated that there was never an excess judgment. That's something that's really interesting because excess judgments are much like this case where a judgment has been $125,000 post verdict is what it tells the policyholder is you're on the hook for the other couple hundred thousand dollars. Figure it out. The statement that was made by the court watcher that you're on your own is very similar to the State Farm that was made you know famously in State Farm v. Campbell where State Farm told its policyholder figure it out. You're gonna have to insurance company took the position that that's not we don't cover that under our policy but at the end of the day in the final distribution extra money was thrown in toward that claim wasn't it? So the ultimate settlement was for 385 which was the verdict of 325 plus interests and costs by analysis that means the entirety of the claim was covered. That was our position. The verdict indicated that there was negligence on the part of Bristol Springs Custom Home for management of its employees and directly against the corporation. That is a covered claim under Charrington in our analysis and our position is that Argo and Colony following the breach of contract complaint agreed because of the overwhelming evidence because of the negotiation and efforts of plaintiff's counsel. My point is even through in the amount that they said that they weren't entitled to pay for. Which ultimately would mean that we have substantially prevailed. I think that's the conclusion. I'm looking at it from a Hayseeds argument. Yes that would entitle us to Hayseeds because they have essentially taken a knee on their coverage issue. Before they said it wasn't covered our complaints filed explaining why everything is covered and then ultimately they agree and pay the verdict. But bottom line is you didn't have to litigate that question. We did litigate that question. I mean there was not a declaratory judgment action that was filed. There was no court ruling that we prevailed on the coverage issue because they paid the claim that ultimately became unnecessary. We did you know litigate the that part of the breach of contract case. You know there was discovery filed and you know communications back and forth with opposing counsel. I've run out of time. I appreciate the court if there are no further questions or if I've responded to Judge Floyd adequately. Thank you so much for your argument. Thank you so much. All right we'll hear I suppose a little bit about the counterclaim or the counterclaim. Yes your honors again on the cross appeal I didn't hear too much dialogue about it from my opposing counsel. So what I'll just follow up is to just reiterate Judge Floyd as I do agree that procedurally we would ask the court affirm on the principal appeal. If of course the court were to determine that it for any reason that were to reverse we would ask that this court reverse under the cross appeal or certified question. I do believe that the law and that West Virginia Supreme Court would in fact conclude that the proper third-party remedies are already established through the Petrollo line of cases and not the Hastings Doctrine. Unless there are any specific questions about our cross appeal I again ask the court affirm on the principal appeal and if it chooses not to to reverse on our cross appeal. Thank you for your time. Well thank both of you for your arguments today and the court is going to adjourn for today until this afternoon I guess for a ceremony session. But in the meantime we're going to come down as we always do and shake hands with you and again Judge Floyd would love to but he's going to do so with a wave or something from the
judges: James Andrew Wynn, Henry F. Floyd, Adam B. Abelson